May it please the Court, my name is Jimmy Feinman. I'm from Lynchburg, Virginia, and I represent Ronald Fleshman in this matter. I'm certain that the Court has studied the briefs, and I'll make a few points and reserve my time for rebuttal. The pertinent facts are stipulated. The subject vehicles have defeat devices which render the emission systems inoperable during use, and the subject vehicles are not covered by a valid certificate of conformity. The Clean Air Act, 42 United States Code Section 7522 prohibits the importation, sale, and use of the subject vehicles as demonstrated in the particular portions of the statute quoted in the briefs. Under the state implementation plans of Virginia and at least 16 other states, which as you know is part of the Clean Air Act, it is illegal to operate vehicles with inoperative emission systems as quoted in the briefs. It makes no sense for Congress to elaborately require emission systems with specified emission limitations and emission standards, and then for the EPA. Wait a minute, okay. It's all very interesting, but you're not even in this case yet. So the whole question here, the other question before us is whether your client is a party in this case, right? Yes, Your Honor. Why don't you address that question? Okay. Your Honor, the way I understood the orders from Chambers is that the court had, maybe I misunderstood, but I thought the court had held that the issues were so similar that you wanted to argue it as a factor. Well, that's true, but you're not a party in the other case either. You're a class member, and you can object to the settlement. Correct. Okay. And, you know, what I'm trying to demonstrate is that the grounds for the need for intervention, if there's not any need for intervention, why intervene? And the need for intervention is that the United States is not commanding compliance with the Clean Air Act, and the statute gives any – All right. The other case has nothing to do with the United States. Which case are we arguing now? Well, I thought you wanted me to argue both of them, so I thought you wanted – I do, but they're still not the same case. I mean, one of them is about whether you have a right to be in the case with the United States, and the other one is whether, for the same substantive reasons, whether you can object to the settlement with Volkswagen, but they're different settlements. That's correct, Your Honor, but they're based on the same predicate facts, and they're based on – Okay. I don't want to argue the intervention issues don't. No, I do. I do. I do, Your Honor. And I absolutely do. And the – what I'm trying to demonstrate first is the need for intervention, that the United States is not commanding compliance, and that the statute – the United States is not commanding compliance with the Clean Air Act, and the statute gives any citizen the right to intervene in those circumstances, and that, as we showed in our briefs, the criteria for intervention is the applicant must assert a significantly protection interest, which the Clean Air Act gives any citizen the right to do that, that disposition of the action without intervention may, as a practical matter, impair or impede the applicant's ability to protect that interest. Are you intervening under 24A – is it A1 or A2? I'm sorry, I couldn't hear you. Are you intervening under A1 or A2 of right? Which one? One of them is where there's a right under a statute. Yeah, I think we – I think we – both. I think in our briefs and our applications, I think we said both, and I think we qualify for both. The applicant's interest must be inadequately represented by the parties to the action, and the applicant's motion must be timely. That's the Donnelly v. Glickman case. And so, you know, I think we meet all of those criteria, most importantly because the plain language of the Clean Air Act prohibits the importation, the sale, and the use of a motor vehicle with an inoperative emission system. Why is Congress going to pass all these laws, as particular and as specific as they are, for a district court and the Planned Steering Committee and the EPA, in this case, to say that it's okay to sell them, it's okay to drive them, and, you know, that's why the need for intervention comes. Did the government say it was okay to sell them? I'm sorry, Your Honor? Did the government say it was okay to sell them? What we showed was that there, and we put it in our briefs, that they repeatedly have published to the public, right on September 18, 2015, they said it is illegal to sell and to operate these vehicles, and that's an incorrect statement. Congress said it's prohibited, and something that is prohibited cannot be allowed to be. So sticking to just the criteria for intervention, Mr. Fletchman has met that, and there's a tremendous need for it. Now, in spite of the clear statutory terms, the EPA has declared these vehicles are illegal to import, to sell, and to operate. There was no notice or hearing before the EPA decided to rewrite the law that Congress enacted. For this very reason, Congress established the Independent Enforcement Authority, allowing any person the right to intervene when the EPA does not command compliance with the Act. The Supreme Court has recently held the EPA cannot alter the requirements of the Clean Air Act to establish with the force of law that otherwise prohibited conduct will not violate the Act. That's the Utility Air Regulatory Group versus EPA case we cited, 134, Supreme Court, 2445. The class action settlement is premised on the EPA's declaration that the dirty diesels are legal to sell and legal to operate. The consent decree incorporates the class action settlement, and on its face, at least, 73,000 of these vehicles to remain in use on the road. That's reached by, it's agreed that there are 487,500 of them, and according to the documents, 15% of them can stay on the road. In reality, there are still over 125,000 of the vehicles on the road, and there is nothing in place to command their removal from use and their removal from the country. We have come here to ask this Court to command compliance with the Clean Air Act by allowing Mr. Fleshman his right of intervention to enforce the Act when the EPA will not do so, and by reversing the settlement of the class action so those 125,000 remaining vehicles can be removed from the road so that their owners can be given notice that they were never given, that their vehicles are illegal to sell and illegal to operate, and that the vehicles must be removed from use, and so an appropriate remedy can be obtained for the consumer's loss. Unless the Court has questions, I would like to reserve my remaining time for rebuttal. Okay. You have reserved about seven, almost eight minutes. Thank you. May it please the Court. Brian Toth in the United States Department of Justice. On behalf of the United States, as a plaintiff, appellee. With me at council table is Ms. Sharon Nellis for defendant appellee, the Volkswagen-related defendants. I intend to speak for 12 minutes and leave three for Ms. Nellis. Okay. The district court correctly denied intervention to Mr. Fleshman in the government civil enforcement action under the Clean Air Act on the ground that the emission standard or limitation on which he bases his intervention right is not already at issue in the government civil enforcement case. Being the Virginia SIP, essentially. Correct. But he says that he is trying to enforce a Federal provision about not being able to drive a car that doesn't have proper certification. He does. He says there is one. I don't know if there is one. So there are, I mean, it's related to the prohibited acts that the government sought to enjoin and restrain and get civil penalties for, but that is not what the text of the intervention provision speaks to. It talks about, and it's a specific term, it's emission standard or limitation under this chapter. And that's actually a defined term in 7604F. And if you look at the various definitions, a provision of an approved state implementation plan clearly falls under F4. But there are other various categories, none of which necessarily readily encompass the government's reliance on the prohibited acts. They don't point to the prohibited acts. You know, we can, for purposes of this case, we can assume that the government is enforcing a standard, but it is not the same one that he's relying on under F4. So under the district court's reasoning and the legal interpretation that we've offered in our brief, in order to have an intervention right under the statute, which is a very compelling right for a citizen to be given, he has to be essentially displaced of his right to bring a citizen suit by the government's enforcement. You're saying if he wants to bring that case, he could go and bring the case by himself? That's, I mean, without speaking to the merits of the case, whether it would fail, yes. That's the idea. And it's demonstrated by the facts. And the only reason people are supposed to come into this case are people who would otherwise not be able to bring their own case. That's right. What about under A2? Under 34A2, the intervention rule. Right. Does that preclude a separate, more traditional kind of intervention? If he could demonstrate it, which I don't think he has, but if he could. We haven't argued that the statute precludes A2. We have never made that argument. But he would have to meet the standards for it. He'd have to meet the standards for A2, yes. Which means, for one thing, he'd have to have standing, which doesn't particularly seem that he does. Correct. Particularly because he's seeking additional relief beyond that which the United States is seeking in the case. But also it's not clear how this is bothering him. That's right. Or that what bothers him about it he couldn't remedy on his own. For example, as an objector, either pursuing his objection on appeal to the class action settlement. Don't drive the car. Or opting out of the class altogether, not driving the car. There are various ways he could mitigate what he's claiming is the injury. And the case law is pretty clear that that type of self-inflicted harm is not actionable under Article III. It's not fairly traceable to the actions of the United States or the Volkswagen defendants, for that matter. It's of his own making. I would like to also suggest there are a couple threshold issues that cut across both A1 and A2. I mean, the standing issue is one that we briefly talked about. Well, if he, I mean, the Clean Air Act provision would take care of the standing issue if he had a right to do it, wouldn't it? If he had a right under the statute. I mean, I suppose we can get into spokio problems. But ordinarily, if it's a citizen's suit and it says you can do it, you probably could do it. Well, that's a matter of the zone of interest under the Clean Air Act he would fall within. You know, if he fell within the citizen's suit provision, he'd take care of that zone of interest inquiry. But I'm not sure that, I mean, the Town of Chester case made clear that where the litigants seeking relief beyond that. Well, that's a different problem. Yes. But it's not an Article III problem as such. Well, I think the Town of Chester case framed it as an Article III standing issue. But it did relate to relief being sought beyond that which the parties were seeking. Or, I mean, really, you know, what he is doing is attempting to bring a cross claim against EPA and saying that EPA has a mandatory duty to take certain administrative or enforcement actions under the statute. And that is a whole separate claim against the United States who has to date been only a plaintiff in the case. So that would have to be supported by Article III standing as well. Just as any claim by a party plaintiff would be. But, I mean, standing aside, I'm happy to talk, engage more about standing. But I think the lack of timeliness, too, is an issue that cuts across both A1 and A2 and provides the court another ground for deciding the case and limiting the case to its facts. And although the district court did not reach the issue of timeliness, that  And I think the record, looking at the record in the context of this case, I think this court, the facts support a conclusion that his intervention request was untimely. And specifically, this was a unique case in that it was highly publicized. There was a lot of money and a lot of effects to consumers at stake. And so the public was on notice when EPA issued its press release in September of 2015 that it believed that the cars were not illegal to drive, illegal to operate, as Mr. Fleshman contends. And so at least from that point in September of 2015, he knew that the government was interpreting the act the way it does, and that is contrary to his interpretation. So he waited a number of months. And the case progressed rapidly, not because the United States necessarily sped it along, but the district judge recognized that the relief at issue implicated half a million cars approximately on the road. And District Judge Breyer ordered the parties to mediate the case at a quick pace. So by... But just because I'm curious, I'm interrupting you now. I'm sorry. But it does... The EPA, and I guess the plaintiffs in the settlement, tells people that it's okay not only to drive these cars, which I understand may not be prescribed by the federal statute, but to sell them. That doesn't... It seems like the statute specifically says it isn't. You know, that's something that I haven't looked at carefully, but it does trouble me. And the best I could say, assuming you're correct... Well, I mean, 75223A3B says it is prohibited for any person to manufacture or sell or offer to sell any part or component intended for use with a motor vehicle when a principal effect of the part is to bypass, defeat, or render inoperative any device or element designed for compliance with regulations under the subchapter, and where he knows or knows that it's being offered for sale, etc. So I don't understand it. It may have been an ill-advised, poorly worded last sentence of that press release. I understand the driving part. I don't understand the selling part. Right. No, I would have to look into that further, and it does trouble me a bit. But, you know, there were a lot of fast-moving pieces to this whole set of cases. Well, I understand that you want to frighten people and tie them up and so on, but... Right. Well, I mean, EPA and the United States chose here to exercise their enforcement discretion in the way that was most efficient in going after Volkswagen and other manufacturers. Well, it's one thing to say we're not going to enforce it against you, but it's another thing to say it's legal. It doesn't seem to be legal. Go ahead. As a part of — just one more thing to that point, Your Honor. The State's receiving benefits under the Environmental Mitigation Trust Fund, that is the approximately $2.7 billion fund that the consent decree establishes to mitigate — it goes to projects to offset the emissions from the cars. The states, when they certify acceptance of those funds, they have to certify its Appendix D3 to the consent decree. It includes an agreement that they will not refuse to license cars or register them in the states based on any presence of a defeat device. So I think that goes to the — at least to the operation, if not a little more extensively to the ownership. And NEPA certainly has chosen to exercise its enforcement discretion here in a way that deemed it was most efficient by going after the manufacturers rather than half a million automobile owners. But to get just one more point about timeliness, you know, there are a number of cases where this Court has said that even where the parties ought to have been — or non-parties, I should say, ought to have reasonably been beyond notice that ongoing negotiations and the fact of ongoing negotiations in a case could reasonably affect their interests if a settlement is reached. And that is the circumstance here. Mr. Fleschman not only ought to have been aware from EPA's press release at the outset of the EPA's interpretation of the Act, but also as the case progressed, a settlement was publicly — the fact of a settlement was publicly announced in April of 2016 and then mentioned again and described in general terms by the district judge at a status conference in May of 2016. But at that time, in late April, is when Mr. Fleschman, instead of attempting to get involved in the federal case, brought his own state court case and actively sought to keep that separate and successfully sought to keep that separate from the federal multidistrict proceedings. So that is just another piece of demonstrating that he ought to have been aware. And he made some strategic litigation calculations, and they ought to have consequences here, one of which is when his state court suit started to go south and he was ultimately unsuccessful, that then he tried — after the oral argument in early August in those cases, he then tried to intervene in the federal enforcement case. But by that time, it was too late. And on the facts of this case, intervention was untimely. So unless the Court has other questions, I would — Okay. Good afternoon, Your Honors. I will be brief. I know you're aware that in addition to — Can I do identification for the record? Oh, I apologize, Your Honor. Sharon Nellis from Sullivan & Cromwell on behalf of the Volkswagen Group of Defendants. Mr. Fleschman, in addition to seeking to intervene in the government enforcement action, of course, also asked this Court to reverse approval of the settlement itself. And what Mr. Fleschman argues at core is that the district court abused its discretion because it did not require a notification to the class that it was illegal to drive the vehicles or sell their vehicles, and that they might face civil or criminal penalties if they did, and that their cause could be confiscated. But why isn't it illegal to resell them under the statute? Excuse me? Why isn't it illegal under the statute to resell them? Under the Canadian statute? Under the profession that I just — yes, under the profession that I just read to you. Yes. You know, I defer to — to Mr. Toth on that point. Well, he didn't — he didn't say it was — he didn't dispute it. He seemed to think maybe it was illegal. I don't think it is illegal. I think it is an appropriate exercise of the enforcement of the EPA. Well, that's a different point. But it's — I don't know what they were — I don't know what's actually in the settlement. But apparently, at the time of the original press release, EPA said car owners should know that although these vehicles have emissions exceeding standards, these violations do not present a safety hazard, and that cars remain legal to drive and resell. That seems to be — that's not a statement that we're not going to do anything to. It's a statement that it's legal, and it's not true. I think what is important, Your Honor, and I cannot — I cannot answer the question posed, but I don't think it is relevant to the question on appeal with respect to the enforcement of the settlement itself, or I should say approval of the settlement itself. Does the settlement have a similar sentence? No, it does not, Your Honor. The settlement — the objection to the settlement rests on the position that class members should have been informed because those class members were at risk, particularly at risk of civil or criminal penalties. And I think it's — and I think it's extremely important to remember that at the time of approval, and still today, that no court and no other authority had taken that position. Obviously, not the Environmental Protection Agency, as you — as you have noted, nor the California Air Resource Board, nor any of the 44 states that resolved their claims on behalf of consumers at the same time the settlement was entered into, and that included the state of Virginia. So what happens? So when somebody comes in for their annual smog check in California or Virginia and the I assume now have been disabled, or doesn't pass because they say, well, you've got a defeat device and we know what happens if it's turned on, so California just says you can drive it anyway? That's correct, Your Honor. First of all, just — I must — as should be obvious, the cars will, in fact, pass inspection because of the defeat device. However, as you know, we all know there is a defeat device in these cars. However, as Mr. Toth noted, and that's been the position from day one of the states as we have been working through this complex resolution plan, that nobody is going to take those hands out of the cars of an innocent consumer, and nobody is going to penalize a consumer because of the actions of Volkswagen. And that is the point that Mr. Fleschman, Appellant Fleschman, is pursuing. No, it's not so obvious. In fact, under the settlement, they had the right to get the full value of their car plus $2,500 or something. They're not so innocent anymore because they made a choice to keep it. No, no, Your Honor. The options under the settlement go expressly to the relief — the relief under the settlement expressly addressed that concern raised by Mr. Fleschman. Under the settlement, either Volkswagen takes back your car and pays you, or it has to fix your car to a certifiable standard. Right. And you don't — but you don't have to do either. That seems to be his complaint. Well — In other words, so the people who are now doing neither aren't so innocent because they had a free way to get it fixed. And that is why the settlement required — it has an incentivization provision, which Mr. Flesch — Mr. Feynman touched upon. The Volkswagen has to recapture 85 percent of the cars. And for every percentage above that that it does not, it — for every percentage it misses, it needs to pay $85 million into this mitigation trust and more than 90 — My only point is it appears to me that the 15 percent of the people — say if — so they get to the 85 percent, and there are still 15 percent of people who haven't gotten their car fixed and haven't turned it in — That's right. — they're not going to have much of an innocent — if any of those people then decide to sell their car, I would think they ought to have a problem. Now, whether that has anything to do with the settlement is another question. I do think it's another question, Your Honor. But I do think what the settlement provides for is to the extent there is that 15 percent out there, that Volkswagen has to ensure that there is enough money in the environment as a result of that remaining 15 percent. Is Virginia — let's assume that the target of 85 percent is met. Yes. But we have 15 percent of the vehicles sold by Volkswagen that have the defeat device. They're still on the road. Yes, Your Honor. Let's imagine that this all takes place and we're now two years from now. Yes, Your Honor. Virginia says, you know, as for those remaining 15, we're going to go after those people. Is there anything in the settlement agreement or anything else that prevents Virginia from doing that? Yes, Your Honor, there is. There are two things, at least. The first is, as Mr. Toth noted, and I will repeat, that every one of the states, including Virginia, has signed a certificate of certification in order to be a participant in the funds that are obtained through the Mitigation Trust. And part of that certification is an agreement that they will not seek enforcement relief beyond that, which is being sought by the EPA. So no state can try now, or two years from now, to go and pull those cars off the road. And so Virginia was a party to the settlement? Yes, Your Honor. And, in fact, the Virginia certification is up on the MDL website, and the form of it is in the record on the excerpt of record before you. Did the government also say that they won't go after anybody? Of course. That is — I think you just took both myself and Mr. Toth at task a little bit for that statement, that they said these cars remain legal to drive and they will not end to sell. Right. Well, that was not in the settlement. Does the settlement say anything else? Well, the settlement — the consumer settlement does not involve the government, so that would not be a position that the government would take as part of the consumer settlement. That would be between us and the plaintiff's steering committee. And the other thing I think that is worth pointing out — So the state's involvement is in the federal government settlement? It's a very complex — very complex, Your Honor. There is a settlement — they are interrelated settlements. The settlement with the Department of Justice on behalf of the EPA is the settlement that sets out the requirements for bringing these cars off the road and paying if we fail to do so. Right. There is — what we have to pay is set forth in the consumer settlement, and that's what we will be arguing about in the next appeal. There is also — that settlement was endorsed in a separate settlement with the Federal Trade Commission, which endorsed that relief as fair. But where are the — but you said the states all signed something. Forty-four. Forty-four states at the same time. The FTC part of it? No. Separate settlements. Forty-four settlements with the states on consumer issues, separate and apart, but at the same time. And there are, I believe, one later settlement, and there remains some litigating. But every single state has entered into the certification as part of the mitigation trust. But none of these states ever took a position that they were going to put any class member or consumer at risk. And this really is the class member. So no class member is facing a risk of having their car confiscated from them. And it certainly was not an abuse of discretion by Judge Breyer. But maybe the five states that didn't settle. They, too, have signed those certifications. And none of those — and what they are settling, what we continue to litigate, has nothing to do with this provision or this concern. And, Judge Fletcher, to finish answering your question, in Virginia, as also previously noted, this also has been litigated in the state court in Virginia who has found that they are not going — that there is no provision by which they — that this is preempted and the state will not pull the cards off the table. Thank you. Mr. Feinman, you saved some time. What everybody is overlooking, with all respect, is the independent enforcement authority granted by the Clean Air Act to any citizen to enforce the act. Well, you could have brought a case and tried to do that. I'm sorry, Your Honor? You could have brought your own case and tried to do it separately. Well, we could have. But I think the Supreme Court case that we cited in the brief says that the better practice is to try to intervene. If you're bringing the same case, but if you bring — if you're enforcing the same provisions, but if you're trying to enforce something else, then you have to bring your own case. Well, Your Honor, with all respect, I think that if we did that — and we certainly can and we certainly will if that's what's required. We'll do whatever's required. But, you know, the MDL process brought all the cases to the San Francisco District Court, and we thought that was the proper place to do it in front of all the parties. We can do that, and we will if that's what's necessary. But the problem is, if we did that, the class settlement releases the rights of these 125,000 people that still have their vehicles on the road, that think that it's legal to drive and to sell these. And, Your Honor — Your Honor, do you — is there really any realistic chance that they're — aside from whether they should get in trouble, is there any realistic chance given the settlements with the states that have been described? Yeah. Why? Because the Independent Enforcement Authority allows any citizen to enforce this act. And the problem is, with regard to the class action settlement, is that the rights of these 125,000 people against Volkswagen have been released without them knowing that they're subject to an Independent Enforcement Authority Enforcement Act. And, you know, the Congress foresaw exactly what's happened here, that the government will not — whether it be the states or the federal government — will not enforce the act. And that's why they gave us a very robust citizen suit provision that we are pursuing. I want to look at my notes. Your Honor also is overlooking — when Your Honor says that the Clean Air Act does not prevent the operation of the vehicles, I think Your Honor is overlooking the state implementation plans that we quoted in the brief, including Virginia's — I understand that. But Virginia takes the position that the state implementation plan does not mean what you say it means. No, that's not correct. The state of Virginia doesn't do that. Well, yes, they do. They say that the provision about operation only deals with post-purchase to feed of a — I don't think that Virginia has said that, but I'll address it if they tried, that, you know, the enforcement of the Clean Air Act is a continuum. If you study the act, it begins with having to have a certificate of conformity before you ever import the vehicle or sell it. Okay, because Congress recognized we've got to have an enforcement of the act before it's ever sold. But after it's sold, then the state implementation plans have to enforce the And the case law says that original certification does not excuse the obligation to comply with the act all the way through the useful life of the vehicle and even after the useful life of the vehicle. So, you know, I disagree with Your Honor when you say Virginia has said that. The Virginia statute is very clear, and we've quoted it. It's illegal and is prohibited to operate a motor vehicle without an emission system. Why in the name of whatever are we going to have a law that says we've got to have all these emission systems to control emissions, and then we're going to let courts and parties say, no, you don't have to do that. We don't need an emission system. You can leave 125,000 vehicles on the road. That is a horrible precedent. It's not the law, and it's a horrible precedent for the future. Now, where's the 125,000 come from? Is that the 15% that will still be after the 85% target has been met? I understand your question. The 15% comes out to 72,000. But the parties to the settlement filed, I believe it was November 30th, a report saying where they are in terms of removing these vehicles, and there's over 125,000 still on the road. But we may end up meeting the 85,000. Excuse me. We may end up meeting the 85% goal. Well, is that possible? Yes, it's possible. But I would submit that. It looks as though actually the 85% target is achievable. Well, I don't think it is because if the money that they offered was good enough, it would have already been taken. And I don't think it is. But in any event, that remains to be seen. But your 125,000 figure is on the assumption that it comes up to only about 70%. Is that right? That's the reality as of November 30th, according to the report. But still, they're going to stop. Once they hit the 85%, they're still going to leave 72,000 on the road. Then there's not going to be any incentive for them to continue. Is there anything in the settlement agreement that says if the 85% goal is achieved, they no longer have to comply with the offer that they would be making previously? I don't think so. I don't think there's anything in the settlement that says that. So, in other words, once it's at 85, to the extent that people are still willing to accept the incentives, they'll do it. So they may get more than 85. Well, they could. I think there's a time limit on when the people have to make the claim. I think it's May of 2018, but I may be incorrect on that. I'd have to look at it to double check. I want to look at the timeliness issue. I don't think it's valid at all. If I could just turn to my notes. The measurement, the settlement was announced on June 28, 2016. They want us to presume that they're not going to enforce the Clean Air Act. We had no idea about what they were doing until June 28. And then it was released. And then the motion to intervene was filed on August 23rd, which was 56 days after the proposed partial consent decree was filed and 56 days before the hearing was scheduled on the matter before the district court. This court has allowed intervention 20 years after consent decrees were submitted. Again, focus on the state implementation plans. They can be enforced by a citizen suit. I've shown the court 17 of them that say it is illegal to operate these vehicles. And Mr. Fleshman and other Virginians are going to enforce that either here or in a separate suit. And when we do, the class and those people who own those vehicles, their rights against Volkswagen have been released. And that's not right for them to be exposed to legal liability when their rights have been released against Volkswagen, because it's Volkswagen that's supposed to pay for this, not them. The independent enforcement authority is the key to the whole thing. The people have the right to enforce this regardless of what the state of Virginia or other states do, regardless of what the EPA does. And if that's the route that we have to go, we'll have to go that route. But those people, their rights will be released if it's not reversed. We ask the court to reverse both the consent decree, allow Mr. Fleshman to intervene, and reverse the class action. Okay, thank you very much. The case just argued is submitted.
judges: Tashima, W. Fletcher, Berzon